IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA

| | | |
|---|---|---|
| Sheila Roach, | ) | C/A No.: 2:14-2730-RMG-MGB |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | REPORT AND RECOMMENDATION |
| Carolyn W. Colvin, Acting | ) | |
| Commissioner of Social Security | ) | |
| Administration, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

This appeal from a denial of social security benefits is before the court for a
Report and Recommendation ("Report") pursuant to Local Civ. Rule 73.02(B)(2)(a)
(D.S.C.). Plaintiff brought this action pursuant to 42 U.S.C. § 405(g) and § 1383(c)(3) to
obtain judicial review of the final decision of the Commissioner of Social Security
("Commissioner") denying her claim for Supplemental Security Income ("SSI"). The two
issues before the court are whether the Commissioner's findings of fact are supported by
substantial evidence and whether she applied the proper legal standards. For the reasons
that follow, the undersigned recommends that the Commissioner's decision be reversed
and remanded for further proceedings as set forth herein.

I.     Relevant Background

A.     Procedural History

On March 2, 2011, Plaintiff filed an application for SSI in which she alleged her
disability began on June 25, 2006. Tr. at 130, 162–68. Her application was denied

initially and upon reconsideration. Tr. at 149–52, 153–54. On November 27, 2012, Plaintiff had a hearing before Administrative Law Judge ("ALJ") Gregory M. Wilson. Tr. at 37–65 (Hr'g Tr.). The ALJ issued an unfavorable decision on April 11, 2013, finding that Plaintiff was not disabled within the meaning of the Act. Tr. at 11–36. Subsequently, the Appeals Council denied Plaintiff's request for review, making the ALJ's decision the final decision of the Commissioner for purposes of judicial review. Tr. at 1–5. Thereafter, Plaintiff brought this action seeking judicial review of the Commissioner's decision in a complaint filed on July 3, 2014. [ECF No. 1].

B.    Plaintiff's Background and Medical History

1.    Background

Plaintiff was 45 years old at the time of the hearing. Tr. at 42. She completed the eleventh grade. *Id.* Although she worked briefly at a convenience store, she has no past relevant work. Tr. at 59. She alleges she has been unable to work since July 30, 2010. Tr. at 41.

2.    Medical History

Plaintiff presented to the emergency department at AnMed Health on March 21, 2010, complaining of increased back pain after sustaining a fall two days earlier. Tr. at 249. Plaintiff had limited range of motion ("ROM") in her lumbar spine with paravertebral tenderness and muscle spasm, but she had normal ROM in her extremities and negative straight-leg raise test. Tr. at 250. Her pain improved with medication. Tr. at

251. She was discharged with a prescription for muscle relaxants and instructed to follow up with her family doctor or pain management physician within the week. Tr. at 252.

On April 1, 2010, Plaintiff visited Eric Loudermilk, M.D. ("Dr. Loudermilk"), for a pain management follow up visit and medication refills. Tr. at 285. Dr. Loudermilk indicated Plaintiff was "very depressed" because her daughter left her with her grandchildren and her brother-in-law recently passed away. *Id.* He noted he had provided medication samples to Plaintiff because she lacked prescription drug coverage and health insurance. *Id.* He also indicated Plaintiff had been compliant with her prescriptions and appointments. *Id.* Dr. Loudermilk noted Plaintiff's diagnoses to include lumbar post-laminectomy syndrome with chronic low back and left leg pain secondary to epidural fibrosis and scar tissue; chronic left-sided L4-5 lumbar disc protrusion with persistent low back and left leg pain secondary to radiculopathy; musculoskeletal low back pain; and chronic depression and anxiety disorder. *Id.* He refilled Plaintiff's medications, provided more samples, and instructed Plaintiff to follow up in two months. *Id.*

Plaintiff followed up with Dr. Loudermilk on June 1, 2010. Tr. at 284. She denied side effects from her medications and indicated her medications improved her pain and quality of life. *Id.* Dr. Loudermilk refilled Plaintiff's prescriptions for Lortab and Klonopin and provided samples of Cymbalta, Lyrica, and Celebrex. *Id.*

Plaintiff presented to Sherri L. Cheek, APRN ("Ms. Cheek"), in Dr. Loudermilk's office on July 30, 2010. Tr. at 283. She requested medication refills. *Id.* Plaintiff stated

she was taking Celebrex twice a week because of abdominal pain, but was taking her other medications as prescribed and had no side effects from them. *Id.* Plaintiff indicated she fell a few weeks earlier after a mouse ran over her foot. *Id.* She reported increased pain in her back and bilateral lower extremities following the fall. *Id.* Ms. Cheek prescribed a Medrol dosepack to address the acute flare in Plaintiff's back pain. *Id.* A drug screen showed Plaintiff to be compliant with her prescriptions and to be taking no illicit substances, and Ms. Cheek noted Plaintiff had been compliant with her medications in the past. *Id.*

Plaintiff again presented to the emergency department at AnMed Health on August 15, 2010, complaining of pain in her back and left flank as the result of a fall. Tr. at 254. A CT scan of Plaintiff's abdomen and pelvis was normal. Tr. at 269. An x-ray of her sacrum and coccyx indicated mild degenerative disc disease in the right sacroiliac joint and an x-ray of her lumbar spine showed degenerative disc disease and spondylosis to be moderate at L2-3 and L4-5 and mild at L3-4. Tr. at 270, 271. James Stumpff, M.D., indicated Plaintiff could return to work without restrictions. Tr. at 256.

On September 29, 2010, Plaintiff followed up with Dr. Loudermilk for medication refills. Tr. at 282. Dr. Loudermilk described Plaintiff as "an unfortunate 42-year old female with failed back syndrome and chronic pain in her lower back and left leg." *Id.* He indicated Plaintiff battled a lot of depression and anxiety and had a lot of social and family issues. *Id.* He noted Plaintiff had always been compliant with her prescriptions

and appointments and tolerated her medications without side effects. *Id.* Dr. Loudermilk refilled Plaintiff's medications and referred her to Kashfia Hossain, M.D. ("Dr. Hossain") for psychiatric management and treatment. *Id.*

On November 17, 2010, Plaintiff visited Dr. Loudermilk for follow up and medication refills. Tr. at 281. She complained of pain and spasms over the left side of her neck and in her suprascapular region. *Id.* She indicated she had been unable to see Dr. Hossain because she could not afford to pay $200 for an initial evaluation. *Id.* Dr. Loudermilk observed Plaintiff to have two localized areas of tenderness and administered trigger point injections. *Id.* He indicated Plaintiff was compliant with her medications and appointments, refilled her medications, and encouraged her to see a psychiatrist for depression and anxiety. *Id.*

Plaintiff followed up with Dr. Loudermilk on January 14, 2011, to obtain medication refills. Tr. at 280. Dr. Loudermilk indicated Plaintiff responded well to the trigger point injections administered during her last appointment. *Id.* He stated Plaintiff had been unable to see a psychiatrist due to the cost. *Id.* He indicated Plaintiff was compliant with her medications and appointments. *Id.* Dr. Loudermilk refilled Plaintiff's medications, gave her samples of Cymbalta and Lyrica, encouraged her to see a psychiatrist, and instructed her to follow up in two months. *Id.*

Plaintiff visited Gerald Welch, D. Min., for family therapy on February 9, 2011, February 21, 2011, and March 2, 2011. Tr. at 272–75. On February 9, she reported being

more upset and depressed and described abuse she endured as a child. Tr. at 274. On February 21, she reported sleep problems and described problems with her incarcerated daughter and a history of childhood sexual abuse. Tr. at 275. She stated she had taken Cymbalta and Klonopin for three years and indicated they helped because she would not leave her house before she started taking them. *Id.*

Plaintiff presented to Ms. Cheek on March 16, 2011, for follow up and medication refills. Tr. at 277. Ms. Cheek indicated Plaintiff was taking Lortab, Klonopin, Celebrex, Cymbalta, and Lyrica, and was doing well without side effects. *Id.* She stated Plaintiff shared joint custody of her grandchildren with the children's other grandparents, which created a lot of stress and worsened her pain. *Id.* Plaintiff complained of increased muscle spasms. *Id.* Ms. Cheek refilled Plaintiff's medications, and prescribed a muscle relaxant. *Id.*

On March 31, 2011, Dr. Loudermilk completed a questionnaire regarding Plaintiff's mental condition. Tr. at 289. He indicated Plaintiff's diagnoses included depression and anxiety and that he prescribed Klonopin and Cymbalta. *Id.* Dr. Loudermilk noted medication had helped Plaintiff's condition, but stated psychiatric care had been recommended. *Id.* He indicated Plaintiff was oriented to time, person, place, and situation; had an intact thought process; had appropriate thought content; and had adequate attention/concentration and memory. *Id.* However, he noted Plaintiff had a worried/anxious mood/affect and exhibited slight work-related limitation in function due

to her mental condition. *Id.* Dr. Loudermilk suggested Plaintiff was capable of managing her funds. *Id.*

Plaintiff presented to Anderson-Oconee-Pickens Mental Health Center for initial clinical assessment on April 20, 2011. Tr. at 291. She reported mood disturbance, panic, tearfulness, and recent changes/stressors. *Id.* Cheryl Rogers, MA, LPC/I ("Ms. Rogers"), observed Plaintiff to demonstrate confusion and tearfulness, but to be oriented to person, place, time, and situation. *Id.* She indicated Plaintiff was not a threat to herself or others and diagnosed adjustment disorder without depressed mood and indicated a need to rule out anxiety disorder, not otherwise specified ("NOS") and personality disorder. Tr. at 291–92. Ms. Rogers recommended Plaintiff's needs be met in the community through pastoral counseling and pain management. Tr. at 290, 292.

On May 11, 2011, Dr. Loudermilk indicated Plaintiff's pain was stable on her medications, but was exacerbated by stress. Tr. at 311. He refilled Plaintiff's prescriptions for Lortab and Klonopin, instructed her to continue Baclofen, Celebrex, Lyrica, and Cymbalta, and provided samples of Cymbalta and Lyrica. *Id.*

State agency consultant Debra C. Price, Ph. D. ("Dr. Price"), completed a psychiatric review technique ("PRT") on May 12, 2011. Tr. at 124–25. She considered Listings 12.04 for affective disorders, 12.06 for anxiety-related disorders, and 12.08 for personality disorders and found Plaintiff to have mild restriction of activities of daily living, mild difficulties in maintaining social functioning, and mild difficulties in

7

maintaining concentration, persistence, or pace. Tr. at 124. She concluded Plaintiff's mental impairments were non-severe. *Id.*

Plaintiff presented to the emergency department at AnMed Health on May 18, 2011, complaining of back pain and numbness with tingling and radiation into her right arm and leg. Tr. at 293. She also reported a right-sided headache, blurred vision, and anxiety. *Id.* Plaintiff reported her symptoms began after she became upset while visiting her daughter in prison. *Id.* Erin Booth, PA-C ("Ms. Booth"), observed Plaintiff to have full ROM without tenderness in her back or neck and normal sensation and reflexes. Tr. at 294. She indicated Plaintiff appeared depressed. *Id.* She indicated Plaintiff felt better with medicine and appeared to be drug-seeking. *Id.*

On May 18, 2011, state agency medical consultant Seham El-Ibiary, M.D. ("Dr. El-Ibiary"), completed a physical residual functional capacity ("RFC") assessment and found Plaintiff could occasionally lift and/or carry 20 pounds; frequently lift and/or carry 10 pounds; stand and/or walk for a total of two hours; sit for a total of about six hours; occasionally operate foot controls with her left lower extremity; never climb ladders/ropes/scaffolds; frequently climb ramps/stairs and balance; and occasionally stoop, kneel, crouch, and crawl. Tr. at 126–27.

On June 26, 2011, Plaintiff visited the emergency department at AnMed Health with a skin infection. Tr. at 297–98. Jeanette Kinsey, M.D., indicated Plaintiff could return to work without restrictions. Tr. at 298.

Plaintiff presented to Meredith Purgason, APRN, in Dr. Loudermilk's office on July 8, 2011. Tr. at 312. She reported her husband had started a new job at Michelin and that she would soon have insurance coverage. *Id.* Ms. Purgason indicated, "[p]er Dr. Loudermilk's plan once she has insurance coverage we will refer her to a spine surgeon for evaluation as to whether or not surgery may be beneficial for her." *Id.* She stated Plaintiff continued to complain of increased stress related to her daughter. *Id.* Ms. Purgason refilled Plaintiff's prescriptions for Lortab and Klonopin, instructed her to continue taking her other medications, and provided samples of Cymbalta and Lyrica. *Id.*

On August 17, 2011, Dr. Loudermilk completed another mental status assessment. Tr. at 313. He indicated Plaintiff's mental diagnoses included depression and anxiety disorder, for which she was prescribed Cymbalta and Klonopin. *Id.* He noted the medication had helped Plaintiff's condition, but psychiatric care was recommended. *Id.* Dr. Loudermilk acknowledged Plaintiff was unable to afford to see a psychiatrist. *Id.* He indicated Plaintiff was oriented to time, person, place, and situation; had intact thought process; had appropriate thought content; and had adequate attention/concentration and memory. *Id.* Dr. Loudermilk observed Plaintiff's mood/affect to be depressed and indicated Plaintiff exhibited obvious work-related limitation in function due to her mental condition. *Id.* Finally, he assessed Plaintiff to be capable of managing her own funds. *Id.*

On August 25, 2011, Plaintiff presented to Robin L. Moody, Ph. D., LPC ("Dr. Moody") for a consultative evaluation. Tr. at 314–16. Plaintiff reported feeling down and

having difficulty falling asleep; taking several naps during a typical day; being withdrawn; avoiding leaving her house; and having sporadic suicidal ideations. Tr. at 314. Plaintiff also complained of severe anxiety and reported hearing "horrible words" from an "evil voice." *Id.* She endorsed a history of sexual, emotional, and physical abuse as a child. Tr. at 315. Dr. Moody observed Plaintiff to walk with a cane and to have difficulty sitting in her seat during the evaluation. *Id.* Plaintiff spoke clearly, answered all questions, had logical and goal-directed thought processes, had a cooperative attitude, and concentrated adequately. *Id.* Dr. Moody indicated Plaintiff appeared to be of average intelligence and had a sad and tearful mood described as "down." *Id.* Plaintiff's memory was poor for past dates and places. *Id.* She scored 28 of a possible 30 on the Mini-Mental State Exam. *Id.* She missed three items in the serial sevens test, but was able to spell the word "world" backwards. *Id.* She missed one item for delayed recall. *Id.* Dr. Moody indicated Plaintiff was capable of performing light chores and simple meals. Tr. at 316. She found Plaintiff had stable relationships with her family and some close friends at church, but did not leave her house more than once a week. *Id.* She indicated Plaintiff had adequate concentration, persistence, and pace; was able to carry out simple instructions; and was capable of managing her own funds. *Id.* Dr. Moody also found Plaintiff "may be exaggerating some symptoms" based on the fact that Plaintiff missed six items on the Rey's 15 Item Malingering Test, which suggested a strong chance of malingering. *Id.* Dr.

Moody diagnosed panic disorder without agoraphobia, depressive disorder, NOS, physical abuse of child (victim) and sexual abuse of child (victim). *Id.*

Plaintiff followed up with Ms. Purgason on September 1, 2011, and reported her back and leg pain had worsened. Tr. at 321. Ms. Purgason indicated Dr. Loudermilk planned to refer Plaintiff to a neurosurgeon as soon as she had insurance, but Plaintiff had not obtained insurance through her husband's employment. *Id.* Plaintiff stated her medications helped and denied adverse effects. *Id.* She continued to endorse stress and anxiety related to her relationship with her daughter. *Id.* Ms. Purgason indicated Plaintiff continued to share custody of her five- and six-year-old grandchildren. *Id.* She refilled Plaintiff's prescriptions and provided samples of Lyrica and Cymbalta. *Id.*

State agency medical consultant Dale Van Slooten, M.D. ("Dr. Van Slooten"), reviewed the record and completed a physical RFC assessment on September 14, 2011, in which he assessed the same limitations as Dr. El-Ibiary. Tr. at 139–40.

State agency psychologist Martha Durham, Ph. D., completed a second PRT on October 3, 2011, and reached the same conclusions as Dr. Price. Tr. at 137–38.

Plaintiff followed up with Ms. Purgason on November 4, 2011, and indicated she was recently denied disability benefits. Tr. at 320. She complained of increased pain in her left hip, left leg, and bilateral feet. *Id.* Plaintiff reported her medications were working and denied adverse side effects. *Id.* Ms. Purgason recommended Plaintiff increase her Lyrica dosage to two tablets at bedtime to address the increased pain in her feet. *Id.* She

refilled Lortab and Klonopin, instructed Plaintiff to continue her other medications, and gave her samples of Lyrica and Cymbalta. *Id.* Dr. Loudermilk provided Plaintiff with a prescription for a handicapped placard during the visit. Tr. at 323.

On January 4, 2012, Plaintiff presented tearfully to Ms. Purgason and reported that her father had unexpectedly passed away four days earlier. Tr. at 319. She complained of increased back pain and more weakness in her lower extremities. *Id.* Ms. Purgason indicated Plaintiff declined a referral to a neurosurgeon because she lacked insurance, but indicated she would see Dr. Houssain for evaluation and treatment of depression. *Id.* She noted Plaintiff reported no adverse effects from her medications and continued to be compliant with her prescriptions and appointments. *Id.* Ms. Purgason refilled Lortab and Klonopin, instructed Plaintiff to continue her other medications, and provided medication samples. *Id.*

Plaintiff followed up with Ms. Purgason on March 2, 2012, for follow up and medication refills. Tr. at 318. Plaintiff stated her back and lower extremity pain had worsened. *Id.* Ms. Purgason noted Plaintiff still lacked insurance coverage and had not been referred to a neurosurgeon. *Id.* Plaintiff reported her medications continued to help and she continued to tolerate them without side effects. *Id.* Ms. Purgason noted Plaintiff had been compliant with her prescriptions and appointments and stated she would refill Plaintiff's medications and complete paperwork for her to receive prescription assistance. *Id.*

On April 26, 2012, Plaintiff again reported to Ms. Purgason that she felt her back pain was getting worse. Tr. at 322. She also complained of increased weakness in her lower extremities at times. *Id.* Ms. Purgason again reported Plaintiff had not yet obtained insurance through her husband's employer, but hoped to soon have coverage to see a neurosurgeon. *Id.* She indicated Plaintiff continued to be compliant with her prescriptions and appointments. *Id.*

Plaintiff presented to the emergency department at AnMed Health on May 8, 2012, complaining of back pain, after having fallen four days earlier. Tr. at 326, 333. She reported her grandchild subsequently jumped on her back, which worsened her pain. Tr. at 333. She stated she was unable to walk or bear weight. *Id.* The physician observed Plaintiff to have mild tenderness in her back. Tr. at 328. He also noted she had an independent and steady gait and was able to get up and down without assistance. Tr. at 334.

On June 20, 2012, Plaintiff reported to Dr. Loudermilk that she had fallen around Mother's Day and thought she broke her tailbone, but x-rays were negative. Tr. at 335. Dr. Loudermilk indicated Plaintiff still did not have insurance. *Id.* He noted Plaintiff continued to be compliant with her prescriptions and appointments and that he would refill her medications and provide her with samples of Lyrica and Cymbalta. *Id.*

On September 27, 2012, Plaintiff's attorney contacted Dr. Loudermilk by letter with several questions. Tr. at 337–38. Dr. Loudermilk indicated he had treated Plaintiff

since July 2006 for chronic pain in her low back and left leg due to failed back syndrome with scar tissue and radiculopathy, chronic neck pain, and depression. Tr. at 337. He provided specific limitations set forth in detail below and indicated "I do not feel she is able to return to a status of gainful employment due to chronic pain issues as well as chronic depression and anxiety." Tr. at 337–38.

### C.     The Administrative Proceedings

#### 1.     The Administrative Hearing

##### a.     Plaintiff's Testimony

At the hearing on November 27, 2012, Plaintiff testified she lived with her husband and 24-year-old son. Tr. at 43. She indicated she was robbed while working in a convenience store in November 2001. *Id.* She stated she attempted to return to work at another convenience store, but was too afraid to maintain the job. Tr. at 44. She testified she subsequently injured her back while attempting to move a birdbath in her yard and required back surgery in June 2005. *Id.* Plaintiff indicated she began seeing Dr. Loudermilk for pain management after her surgery. *Id.*

Plaintiff testified she had difficulty sleeping. Tr. at 45. She stated she typically awoke around nine o'clock in the morning and went to sleep around midnight. *Id.* She indicated she napped for an average of four to five hours per day. *Id.* She testified she did not often leave her home, but stated she attended church and doctor's visits when she went out. Tr. at 46.

Plaintiff testified she experienced anxiety and daily panic attacks, which were characterized by breathing difficulty, rapid heartrate, faintness, and fear. Tr. at 46–47. She indicated she had considered harming herself because she felt like she was a burden on others. Tr. at 47. She also described hearing "something terrible" that was a hallucination. Tr. at 47–48. She indicated she had not seen a psychiatrist because she could not afford the visit. Tr. at 54.

Plaintiff testified she had experienced swelling in her feet since she injured her back, but indicated the swelling had worsened within the last year. Tr. a 50. She stated she fell "a lot" in her home, but then clarified that it was less than once a week on average. Tr. at 51. She indicated she began using a cane approximately two years after her back surgery based on Dr. Loudermilk's recommendation. *Id.* She testified she could lift her Bible and her purse, but was unable to lift a gallon of milk. Tr. at 52. She stated she could sit for 35 to 45 minutes at a time, but would need to stand for 10 to 15 minutes before sitting again. Tr. at 52–53. She indicated she could not alternate sitting and standing for more than a few times because she needed to lie down with pillows to ease her pain. Tr. at 53.

Plaintiff testified she could wash dishes while leaning against the sink for less than 20 minutes at a time. Tr. at 48–49. She stated she could reheat food, start her washing machine, and fold clothes. Tr. at 49. She indicated she allowed her driver's license to lapse after she became ill because her pain and medications reduced her ability to react.

15

Tr. at 50. She testified her husband paid the bills and her husband and son shopped for groceries. *Id.* She stated she required help getting in and out of the shower and with putting on shoes and pants. Tr. at 50–51. She indicated she spent her days reading, watching television, and lying down, but denied having a home computer. Tr. at 56.

Plaintiff testified her medications helped her pain, but not as well as they did when she first started taking them. Tr. at 57. She indicated her medications caused her stomach to hurt. *Id.*

### b.    Vocational Expert Testimony

Vocational Expert ("VE") Carey A. Washington reviewed the record and testified at the hearing. Tr. at 59–64. The ALJ described a hypothetical individual of Plaintiff's vocational profile who could lift 20 pounds occasionally and 10 pounds frequently; stand for two hours out of an eight-hour workday; walk for two hours out of an eight-hour workday; sit for six hours out of an eight-hour workday; never climb ladders, ropes, or scaffolds; occasionally climb, stoop, kneel, crouch, and crawl; frequently balance; and must avoid moderate exposure to hazards. Tr. at 60. The ALJ asked whether there were any jobs in the regional or national economy that the hypothetical person could perform. *Id.* The VE identified jobs at the sedentary exertional level with a specific vocational preparation ("*SVP*") of two as an addresser, *Dictionary of Occupational Titles* ("*DOT*") number 209.587-010, with 3,000 jobs in South Carolina and 125,000 jobs nationally; a weight tester, *DOT* number 539.485-010, with 5,000 jobs in South Carolina and 200,000

jobs nationally; and a telephone quotation clerk, *DOT* number 237.367-046, with 6,000 jobs in South Carolina and 100,000 jobs nationally. *Id.*

Plaintiff's attorney asked the VE if the jobs identified in response to the ALJ's hypothetical required the individual to work in two-hour blocks of time. Tr. at 61. The VE responded that individuals were generally expected to work for two hours at a time before taking a break. Tr. at 61–62. He indicated that an employer may allow an individual to take two or three minutes off task during the two-hour block of time, but would not likely allow the individual to take multiple two to three minute breaks during a two-hour block of time. Tr. at 62. Plaintiff's attorney asked if the individual would be expected to maintain a seated position while performing the jobs. *Id.* The VE testified the jobs would allow the individual to stand, but would not allow her to lie down. *Id.* Plaintiff's attorney asked how much time would be permitted for a break between two-hour blocks of work. Tr. at 63. The VE testified a typical break would be 15 minutes and indicated longer breaks would generally not be tolerated. Tr. at 63–64.

2.    The ALJ's Findings

In his decision dated April 11, 2013, the ALJ made the following findings of fact

and conclusions of law:

1.    The claimant has not engaged in substantial gainful activity since March 2, 2011, the date the application was filed (20 CFR 416.971 *et seq.*).

2.    The claimant has the following severe impairments: obesity and disorders of the back (20 CFR 416.920(c)).

3.    The claimant does not have an impairment or combination of impairments that meets or medically equals one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 416.920(d), 416.925 and 416.926).

4.    After careful consideration of the entire record, I find the claimant has the residual functional capacity to perform reduced sedentary work as defined in 20 CFR 416.967(a). She is capable of lifting 20 pounds occasionally and 10 pounds frequently. She can stand or walk for two hours in an eight hour workday. She can sit for six hours in an eight hour workday. Claimant can never climb ropes, ladders, or scaffolds. She can balance frequently. She is capable of occasional climbing, stooping, kneeling, crouching, and crawling. She should avoid moderate exposure to hazards.

5.    The claimant has no past relevant work (20 CFR 416.965).

6.    The claimant was born on November 26, 1967 and was 43 years old, which is defined as a younger individual age 18–44, on the date the application was filed (20 CFR 416.963).

7.    The claimant has a limited education and is able to communicate in English (20 CFR 416.964).

8.    Transferability of job skills is not an issue because the claimant does not have past relevant work (20 CFR 416.968).

9.    Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform (20 CFR 416.969, and 416.969(a)).

10.    The claimant has not been under a disability, as defined in the Social Security Act, since March 2, 2011, the date the application was filed (20 CFR 416.920(g)).

Tr. at 16–31.

II.     Discussion

Plaintiff alleges the Commissioner erred for the following reasons:

1)      the ALJ improperly rejected the opinion of Plaintiff's treating pain specialist; and

2)      the Appeals Council neglected to weigh new and material evidence.

The Commissioner counters that substantial evidence supports the ALJ's findings and that the ALJ committed no legal error in his decision.

A.      Legal Framework

1.      The Commissioner's Determination-of-Disability Process

The Act provides that disability benefits shall be available to those persons insured for benefits, who are not of retirement age, who properly apply, and who are under a "disability."  42 U.S.C. § 423(a). Section 423(d)(1)(A) defines disability as:

the inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for at least 12 consecutive months.

42 U.S.C. § 423(d)(1)(A).

To facilitate a uniform and efficient processing of disability claims, regulations promulgated under the Act have reduced the statutory definition of disability to a series of five sequential questions. *See, e.g., Heckler v. Campbell*, 461 U.S. 458, 460 (1983) (discussing considerations and noting "need for efficiency" in considering disability claims). An examiner must consider the following:  (1) whether the claimant is engaged

in substantial gainful activity; (2) whether she has a severe impairment; (3) whether that impairment meets or equals an impairment included in the Listings;[1] (4) whether such impairment prevents claimant from performing PRW;[2] and (5) whether the impairment prevents her from doing substantial gainful employment. *See* 20 C.F.R. § 416.920. These considerations are sometimes referred to as the "five steps" of the Commissioner's disability analysis. If a decision regarding disability may be made at any step, no further inquiry is necessary. 20 C.F.R. § 416.920(a)(4) (providing that if Commissioner can find claimant disabled or not disabled at a step, Commissioner makes determination and does not go on to the next step).

A claimant is not disabled within the meaning of the Act if she can return to PRW as it is customarily performed in the economy or as the claimant actually performed the work. *See* 20 C.F.R. Subpart P, § 416.920(a), (b); Social Security Ruling ("SSR") 82-62

---

[1] The Commissioner's regulations include an extensive list of impairments ("the Listings" or "Listed impairments") the Agency considers disabling without the need to assess whether there are any jobs a claimant could do. The Agency considers the Listed impairments, found at 20 C.F.R. part 404, subpart P, Appendix 1, severe enough to prevent all gainful activity. 20 C.F.R. § 416.925. If the medical evidence shows a claimant meets or equals all criteria of any of the Listed impairments for at least one year, she will be found disabled without further assessment. 20 C.F.R. § 416.920(a)(4)(iii). To meet or equal one of these Listings, the claimant must establish that her impairments match several specific criteria or be "at least equal in severity and duration to [those] criteria." 20 C.F.R. § 416.926; *Sullivan v. Zebley*, 493 U.S. 521, 530 (1990); *see Bowen v. Yuckert*, 482 U.S. 137, 146 (1987) (noting the burden is on claimant to establish his impairment is disabling at Step 3).

[2] In the event the examiner does not find a claimant disabled at the third step and does not have sufficient information about the claimant's past relevant work to make a finding at the fourth step, he may proceed to the fifth step of the sequential evaluation process pursuant to 20 C.F.R. § 416.920(h).

(1982). The claimant bears the burden of establishing her inability to work within the meaning of the Act. 42 U.S.C. § 423(d)(5).

Once an individual has made a prima facie showing of disability by establishing the inability to return to PRW, the burden shifts to the Commissioner to come forward with evidence that claimant can perform alternative work and that such work exists in the regional economy. To satisfy that burden, the Commissioner may obtain testimony from a VE demonstrating the existence of jobs available in the national economy that claimant can perform despite the existence of impairments that prevent the return to PRW. *Walls v. Barnhart*, 296 F.3d 287, 290 (4th Cir. 2002). If the Commissioner satisfies that burden, the claimant must then establish that she is unable to perform other work. *Hall v. Harris*, 658 F.2d 260, 264–65 (4th Cir. 1981); *see generally Bowen v. Yuckert*, 482 U.S. 137, 146 n.5 (1987) (regarding burdens of proof).

2.     The Court's Standard of Review

The Act permits a claimant to obtain judicial review of "any final decision of the Commissioner [] made after a hearing to which he was a party."  42 U.S.C. § 405(g). The scope of that federal court review is narrowly-tailored to determine whether the findings of the Commissioner are supported by substantial evidence and whether the Commissioner applied the proper legal standard in evaluating the claimant's case. *See Richardson v. Perales*, 402 U.S. 389, 390 (1971); *Walls*, 296 F.3d at 290 (*citing Hays v. Sullivan*, 907 F.2d 1453, 1456 (4th Cir. 1990)).

The court's function is not to "try these cases de novo or resolve mere conflicts in the evidence." *Vitek v. Finch*, 438 F.2d 1157, 1157–58 (4th Cir. 1971); *see Pyles v. Bowen*, 849 F.2d 846, 848 (4th Cir. 1988) (*citing Smith v. Schweiker*, 795 F.2d 343, 345 (4th Cir. 1986)). Rather, the court must uphold the Commissioner's decision if it is supported by substantial evidence. "Substantial evidence" is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson*, 402 U.S. at 390, 401; *Johnson v. Barnhart*, 434 F.3d 650, 653 (4th Cir. 2005). Thus, the court must carefully scrutinize the entire record to assure there is a sound foundation for the Commissioner's findings and that her conclusion is rational. *See Vitek*, 438 F.2d at 1157–58; *see also Thomas v. Celebrezze*, 331 F.2d 541, 543 (4th Cir. 1964). If there is substantial evidence to support the decision of the Commissioner, that decision must be affirmed "even should the court disagree with such decision." *Blalock v. Richardson*, 483 F.2d 773, 775 (4th Cir. 1972).

B.      Analysis

1.      Treating Physician's Opinion

Dr. Loudermilk offered his opinion on three occasions before the ALJ issued his decision. On March 31, 2011, Dr. Loudermilk indicated Plaintiff demonstrated a slight work related limitation in function. Tr. at 289. On August 17, 2011, he wrote that Plaintiff had obvious work-related limitations in function due to a mental condition. Tr. at 313. On September 27, 2012, he indicated Plaintiff could not lift or carry over 25 pounds,

stand or walk for prolonged periods, frequently crouch, repetitively lift or carry, repetitively or frequently bend, repetitively or frequently twist, repetitively or frequently crawl, climb, balance, be exposed to unprotected heights, work with heavy machinery, or cope with stressful situations. Tr. at 337. He also stated he did not consider Plaintiff to be able to return to gainful employment because of chronic pain, chronic depression, and anxiety. Tr. at 338.

Plaintiff argues the ALJ improperly rejected the work-preclusive limitations provided by her treating physician. [ECF No. 15 at 18]. She maintains the ALJ ignored the length of her treatment relationship with Dr. Loudermilk and Dr. Loudermilk's medical specialty. *Id.* at 19. She contends the restrictions specified by Dr. Loudermilk were supported by the record. *Id.* at 21–26. Finally, Plaintiff argues the ALJ erred in according greater weight to the non-examining state agency physicians than to her treating physician. *Id.* at 26–27.

The Commissioner argues substantial evidence supports the ALJ's decision to accord only limited weight to Dr. Loudermilk's opinion because it was not supported by the evidence of record. [ECF No. 17 at 14–17]. She maintains the ALJ properly relied on the opinions of the state agency consultants because their opinions were consistent with the record. *Id.* at 17–18.

The Social Security Administration's ("SSA's") regulations and rulings accord significant deference to the opinions of treating physicians. *See* 20 C.F.R. §

23

416.927(c)(2); SSR 96-2p. If a treating source's medical opinion is "well-supported and not inconsistent with the other substantial evidence in the case record, it must be given controlling weight" and adopted "irrespective of any finding" the ALJ would have made "in the absence of the medical opinion." SSR 96-2p; *see also* 20 C.F.R. § 416.927(c)(2). However, the ALJ may decline to accord controlling weight to the treating physician's opinion if persuasive contradictory evidence exists. *Coffman v. Bowen*, 829 F.2d 514, 517 (4th Cir. 1987).

If an ALJ determines a treating physician's opinion is not entitled to controlling weight, the treating physician's opinion may still support a finding that the claimant is disabled and the ALJ is required to consider the opinion, along with all other medical opinions in the record, based on all the factors set forth in 20 C.F.R. § 416.927(c). SSR 96-2p. The factors to be considered include the following: whether an examining relationship exists between the claimant and the provider; whether a treatment relationship exists and, if so, the length of the treatment relationship and frequency of examination and the nature and extent of the treatment relationship; the supportability of the opinion based on the provider's treatment record; the consistency of the provider's opinion with the record as a whole; the specialization of the medical provider; and any other factors that may be relevant under the particular circumstances. 20 C.F.R. § 416.927(c); *see also Johnson*, 434 F.3d at 654. In all unfavorable and partially-favorable decisions and in fully-favorable decisions based in part on a treating source's opinion, the

ALJ must specify the weight accorded to the treating source's opinion, cite reasons for the weight given, and support his decision with evidence in the case record. SSR 96-2p. The ALJ must always "give good reasons" in the decision for the weight given to a treating provider's opinion. 20 C.F.R. § 416.927(c)(2).

The regulations explain that more weight is generally provided to the opinions of treating physicians because they are "most able to provide a detailed, longitudinal picture" of the claimant's impairment and "may bring a unique perspective to the medical evidence that cannot be obtained from the objective findings alone or from reports of individual examinations, such as consultative examinations or brief hospitalizations." 20 C.F.R. § 416.927(c)(2); *see also Morgan v. Colvin*, C/A No. 9:12-562-RMG, 2013 WL 1786408, at *5 (D.S.C. Apr. 25, 2013) (finding the ALJ erred in failing to note the treating physician's "long and involved history" or contrast it "with the opinions of chart reviewers and one-time examiners"). They provide for greater weight to be given to the opinions of medical providers who have a longer treatment history with the claimant or who have seen the claimant a greater number of times. 20 C.F.R. § 416.927(c)(2)(i). The regulations also indicate ALJs should look to the treatment the medical source has provided and the kind of testing he has performed or ordered from specialists and laboratories. 20 C.F.R. § 416.927(c)(2)(ii). It provides that ALJs should give more weight to treating sources' opinions regarding impairments they treat than to the opinions of non-treating sources. *Id.*

The regulations also indicate ALJs should accord more weight to the opinions of specialists about medical issues related to their areas of specialty than to the opinions on non-specialists. 20 C.F.R. § 416.927(c)(5); *see also Morgan*, 2013 WL 1786408, at *5 (finding "the ALJ failed to note that Dr. Mitchell, as an orthopaedic surgeon, is a specialist and did not contrast his area of specialty, particularly relevant in this matter, with the qualifications of the various chart reviewers and one-time examiners whose opinions were relied upon by the ALJ").

The ALJ indicated he gave "little weight" to the August 2011 questionnaire in which Dr. Loudermilk indicated Plaintiff had obvious work-related limitations due to her mental condition. Tr. at 27. He pointed out that Dr. Loudermilk assessed only slight limitations five months earlier and stated his review of the records from March 2011 to August 2011 showed no more aggressive treatment or additional stressors that would explain a decline in Plaintiff's mental functioning or a change in Dr. Loudermilk's assessment of her limitations. Tr. at 27–28.

The ALJ also gave little weight to Dr. Loudermilk's responses to the September 2012 letter from Plaintiff's attorney. Tr. at 28. He found that Dr. Loudermilk's restriction of no exposure to unprotected heights or heavy machinery was unsupported by the record, which did not indicate complaints, or evidence to suggest, that Plaintiff experienced side effects from medications, insomnia, daytime drowsiness, or fatigue. *Id.* He rejected Dr. Loudermilk's assertion that Plaintiff could not climb or balance because

26

Dr. Loudermilk conducted no physical examination to support his findings and records from other treatment providers indicated Plaintiff had negative straight-leg raising test, normal ROM in her extremities, steady gait, and was able to get up and down without assistance. Tr. at 28–29. Finally, he discounted Dr. Loudermilk's opinion that Plaintiff could not cope with stressful situations due to depression because Dr. Loudermilk was not a mental health professional; his records indicated disturbances in Plaintiff's mental state were typically caused by situational stresses involving the death of family members and legal difficulties with her daughter; and Plaintiff received conservative treatment in the form of medications. Tr. at 29.

The undersigned recommends the court find the ALJ did not adequately consider Dr. Loudermilk's opinion in light of the provisions set forth in 20 C.F.R. § 416.927(c) and SSR 96-2p. Upon cursory review, it appears that the ALJ comprehensively examined Plaintiff's treatment relationship with Dr. Loudermilk. The ALJ acknowledged the examining and treatment relationship between Plaintiff and Dr. Loudermilk when he wrote "[m]edical records from Dr. Eric Loudermilk indicate he treated claimant in April 2010 for failed back syndrome, chronic back and left leg pain." Tr. at 22. He referenced Dr. Loudermilk's treatment notes from June 2010 and indicated "for the next nine months, Dr. Loudermilk saw the claimant every two months, and his treatment consisted of refilling the claimant's prescriptions on each presentations [sic], with the exception of November 2010 when he administered trigger point injections (Id., pp. 2–6). Id. The ALJ

indicated a May 2011 treatment note indicated Plaintiff's pain to be stable, but he acknowledged Plaintiff's complaint of increased pain in her back and legs in September 2011. *Id.* The ALJ also referenced Plaintiff's treatment visits with Dr. Loudermilk in January 2012 and June 2012. *Id.*

Despite the ALJ's multiple references to the treatment relationship, he neglected several factors that were particularly relevant in light of the deference accorded treating physician's opinions under the SSA's regulations and rulings. First, although the ALJ was aware that Plaintiff had treated with Dr. Loudermilk for four years prior to the first treatment note in the record,[3] he neglected to acknowledge the length of the treatment relationship, which is particularly relevant under 20 C.F.R. § 416.927(c)(2)(i). Second, the ALJ ignored the fact that Dr. Loudermilk gave an opinion that he was adequately situated to provide as Plaintiff's only treating physician. *See* 20 C.F.R. § 416.927(c)(2)(ii). The ALJ wrote "[i]t is clear that Dr. Loudermilk generally used medications to treat and control claimant's back pain," but "such treatment cannot support a finding of disability." The ALJ failed to consider that Dr. Loudermilk offered an opinion in light of the fact that he consulted with Plaintiff regularly and prescribed six medications that included Lortab, Klonopin, Cymbalta, Lyrica, Baclofen, and Celebrex in an effort to address her pain, muscle spasms, depression, and anxiety. *See* Tr. at 311.

---

[3] Dr. Loudermilk wrote that he had treated Plaintiff since July 2006, and the ALJ's decision indicates he issued a prior unfavorable decision on August 13, 2010. Tr. at 26, 337.

While the ALJ acknowledged that Dr. Loudermilk had ordered Plaintiff to see a specialist (Tr. at 22), he ignored the fact that, because of Dr. Loudermilk's regular visits with Plaintiff and Plaintiff's inability to afford treatment with the recommended specialists, Dr. Loudermilk remained in the best position to address Plaintiff's mental symptoms and back and leg pain and their limiting effects. Finally, the ALJ ignored the specific provisions of 20 C.F.R. § 416.927(c)(2) that discourage reliance upon consultative examinations and brief hospitalizations to the exclusion of treating physician's opinions. The ALJ rejected Dr. Loudermilk's opinion because he thought Plaintiff "embellished the debilitating impact of her mental and physical impairments" based upon a one-time mental consultation with Dr. Moody, emergency department visits, and the assessments of the non-treating, non-examining state agency consultants. *See* Tr. at 20, 21, 23–24, 26–27.

The ALJ further erred in failing to consider Dr. Loudermilk's opinion in light of his specialty. According to the South Carolina Department of Labor, Licensing and Regulation, Dr. Loudermilk's specialties included anesthesiology and pain management.[4] In disregarding Dr. Loudermilk's opinion, the ALJ did not consider Dr. Loudermilk's specialty as a pain management physician. Thus, he also failed to acknowledge that Dr. Loudermilk's specialty lent greater weight to his opinion regarding the effects of

---

[4] South Carolina Department of Labor, Licensing and Regulation. Medical Board. Available at: https://verify.llronline.com/LicLookup/Med/Med.aspx?div=16.

Plaintiff's pain and prescribed medications on her abilities to be exposed to unprotected heights and heavy machinery, to climb and balance, and to deal with work stressors.

In light of the foregoing, the undersigned recommends the case be remanded for reconsideration of Dr. Loudermilk's opinion under the provisions of 20 C.F.R. § 416.927(c).

### 2.    Evidence Submitted to Appeals Council

On June 26, 2013, Plaintiff submitted to the Appeals Council a letter from Dr. Loudermilk dated May 24, 2013. Tr. at 339, 340. Dr. Loudermilk wrote that Plaintiff had lumbar post-laminectomy syndrome and chronic pain in her low back and left leg and suffered from depression, anxiety, and panic attacks. Tr. at 340. He stated he had managed Plaintiff's pain since July 2006 and had found her to be "a reliable and compliant patient." *Id.* He specified Plaintiff had passed all drug screens, including a most recent screen on April 5, 2013, and had never had any problems with illicit substances since he began treating her. *Id.* He stated the biggest impediment to Plaintiff's treatment was her lack of insurance that had prohibited him from pursuing additional treatment. *Id.* Finally, he indicated that he felt that Plaintiff would improve if she had some type of health coverage. *Id.*

Plaintiff argues the evidence submitted to the Appeals Council was required to be weighed because it was sufficiently material that it might have affected the conclusion of the fact-finder. [ECF No. 15 at 28–30]. The Commissioner maintains the May 2013

statement from Dr. Loudermilk did not provide a reasonable basis for changing the ALJ's decision. [ECF No. 17 at 21–22]. In her reply, Plaintiff argues "there is conflicting evidence that has not been weighed and resolved by the fact-finder." [ECF No. 18 at 13–14].

In light of the undersigned's recommendation that the case be remanded for reconsideration of Dr. Loudermilk's earlier opinions, it is appropriate that the ALJ also consider the opinion submitted to the Appeals Council in combination with the other evidence of record.

III.     Conclusion and Recommendation

The court's function is not to substitute its own judgment for that of the ALJ, but to determine whether the ALJ's decision is supported as a matter of fact and law. Based on the foregoing, the court cannot determine that the Commissioner's decision is supported by substantial evidence. Therefore, the undersigned recommends, pursuant to the power of the court to enter a judgment affirming, modifying, or reversing the Commissioner's decision with remand in Social Security actions under sentence four of 42 U.S.C. § 405(g), that this matter be reversed and remanded for further administrative proceedings.

IT IS SO RECOMMENDED.

_____
MARY GORDON BAKER
UNITED STATES MAGISTRATE JUDGE

July 28, 2015
Charleston, South Carolina